**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA**

**vs.**                                             **CASE NO: 8:21-CR-16-WFJ-SPF**

**PRISCILIANO GARCES ANGULO**
_____/

## **SENTENCING MEMORANDUM**

The Defendant, Prisciliano Garces Angulo (hereinafter "Mr. Garces Angulo"), by and

through his undersigned counsel, respectfully submits this sentencing memorandum for this

Honorable Court's consideration. Mr. Garces Angulo requests that this Court consider and

determine that a variance from the applicable guideline range is appropriate under 18 U.S.C. §

3553, and thus impose a sentence of a total of 120 months of incarceration.

## **STATEMENT OF FACTS**

*Procedural History*

1. Mr. Garces Angulo pled not guilty to count one of his indictment for Conspiracy to

   Possess with the Intent to Distribute Five Kilograms or More of Cocaine, While Aboard a

   Vessel Subject to the Jurisdiction of the United States, in violation of 46 U.S.C. §§

   70503(a), 70506(a) and (b), and 21 U.S.C. § 960(b)(1)(B)(ii).

2. Mr. Garces Angulo also pled not guilty to count two of his indictment for Possession with

   Intent to Distribute Five Kilograms or More of Cocaine, While Aboard a Vessel Subject

   to the Jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a) and

   70506(a), 18 U.S.C. § 2, and 21 U.S.C. § 960(b)(1)(B)(ii).

3. Mr. Garces Angulo went to trial and was ultimately convicted on both counts on April

   13, 2022.

4. This case is presently set for sentencing on June 28, 2022.

*Advisory Guideline Calculation*

5. Prior to unresolved objection, the Presentence Report (PSR) calculates Mr. Garces Angulo's total offense level as a level 40 with a criminal history category of I. PSR at ¶¶ 25; 29. Accordingly, Mr. Garces Angulo faces an advisory guideline sentencing range of 292 to 365 months of incarceration. PSR at ¶ 78. Depending on this Honorable Court's ruling on the PSR objections, the total offense level may be altered.

**MEMORANDUM OF LAW**

This memorandum examines the issue of whether a sentencing range of 292 to 365 months is in fact sufficient, but not greater than necessary, to comply with the sentencing directives laid out in 18 U.S.C. § 3553(a)(2), or if a 120-month sentence, aligning with the minimum mandatory sentence for these charges, would be just as effective. An examination of section 3553 is critical in the instant case since many of its sentencing factors supports Mr. Garces Angulo's request for a variance. *See* 18 U.S.C. § 3553(a).

I. ***Koon and its Progeny Provides the Court with the Discretion to Impose a Variance under 18 U.S.C. § 3553(a).***

Congress set forth Sentencing Guidelines to guide the courts in determining a just and predictable sentence. However, the Supreme Court has made it clear that sentencing discretion remains with the district judge, so that each convicted person may be considered individually, and their case treated as a "unique study in the human failings that sometime mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Congress has expressly affirmed a judge's discretion to consider the fullest information

possible. *See* 18 U.S.C. § 3661.[1] Pursuant to *United States v. Booker*, 543 U.S. 220, 744 (2005), a court is now unencumbered in its ability to "maintai[n] sufficient flexibility to permit individualized sentences when warranted." A court is expected to consider the Sentencing Guidelines but may order any sentence deemed to be reasonable. *Id.* at 745.

To guide a court's discretion, section 3553(a)(2) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of several factors. Against this backdrop of factors, Mr. Garces Angulo respectfully submits that a variance is warranted in his case. As the following sections demonstrate, an advisory guideline sentence would violate the requirement that a defendant's sentence be sufficient, but not greater than necessary, to satisfy the purposes of § 3553(a). *See, Pepper v. United States*, 562 U.S. 476 (2011) (a "sentencing judge's overarching duty under § 3553(a) [is to] to impose a sentence sufficient, but not greater than necessary"). As this memorandum establishes, applying the factors of § 3553(a) to Mr. Garces Angulo's case supports the imposition of a 120-month sentence.

1. **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

The significance of the first factor lies in its comprehension that a court cannot merely focus on a defendant's crime in determining his sentence. Rather, a court must consider the offense against the backdrop of a defendant's life. The Supreme Court has emphasized "[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper v.*

---

[1] "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

*United States*, 562 U.S. 476, 488 (2011) (citation omitted). Consistent with this perspective, one federal jurist has concluded:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics' of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-514 (S.D.N.Y. 2006) (Rakoff, J.).


*The History and Characteristics of the Defendant*

The tenet in *Adelson* that a defendant's criminal conduct must be measured against his overall life has resonance in the instant case. The *Adelson* Court contemplated a balance of an individual's misgivings versus their good will. While Mr. Garces Angulo was paroled into the United States for committing a drug trafficking crime, this conduct is a break from an otherwise law-abiding life. Although the defendant is from a foreign county, where criminal records may not be readily accessible, it is at least implicit through Mr. Garces Angulo's family history that he has been a law-abiding individual prior to the instant conduct.

Mr. Garces Angulo is a 58-year-old Colombian man who comes from a poor family with a humble upbringing. While Mr. Garces Angulo recalls a loving home, he indicated having barely enough clothes to wear and eating "like poor people." Mr. Garces Angulo has only a seventh-grade education because he was forced to leave school when his mother died, and the family could no longer afford to send him to school. His unfortunate circumstance led to a major fork in the road: choosing either to help his family survive or educate himself in the hope of giving his family a better life than he had. While it is true that many in the United States face

overwhelming odds in their pursuit of financial comfort and a better life, for those in Mr. Garces

Angulo's position, it is hard to visualize a path out of their crippling poverty.

As an adult, Mr. Garces Angulo has become the primary caretaker of his elderly father

who is currently suffering from prostate cancer. Mr. Garces Angulo is also a father to eight

children, two of which are minors who rely on his support. The eldest minor child is in bad

health and requires extensive medication to survive.

Mr. Garces Angulo works as a small engine repair mechanic, maintaining a shop in

Timbiqui, Colombia.  He is well known in his community and enjoys a consistent customer base.

His income is modest. He has the ability to feed his family; however, like many in his area, their

lives center more around survival than comfort. Respectfully, his impoverished status, legitimate

employment as a small engine mechanic, and his status as the sole provider for his family are

implicit evidence that he is not a full-time drug trafficker or an individual with proprietary ties to

a drug organization.

*Nature and Circumstances of the Offense*

Mr. Garces Angulo, along with four others, were caught on a Panga-style vessel (PSV) in

International Waters approximately 213 nautical miles south of Tulate, Guatemala by the United

States Coast Guard (USCG) Marine Patrol Aircraft (MPA). The USCG signaled the crew aboard

the PSV to stop multiple times, but the crew did not comply. After eleven rounds of disabling

fire on the vessel's engine, the PSV came to a dead stop in the water and the USCG was able to

intercept and board the vessel. Five individuals were observed, although none of the

crewmembers claimed being the master of the vessel and based upon the known health condition

of Mr. Garces Angulo at the time of interdiction, he was not driving the vessel.

A search of the vessel yielded the seizure of approximately 36 bales of cocaine, weighing a net total of 971 kilograms, individually wrapped in brown-colored paper and inside burlap bags. The PSV crewmembers were detained and transported to the USCG *Harriet Lane* for processing.

Mr. Garces Angulo is not known to be the captain, navigator, or load guard of the vessel, and is thought to have maintained the role of a common mechanic.  If in fact this was his role, he was unable to offer anything of value when the voyage made way due to horrific seasickness and incapacitation.  Almost immediately upon departure, Mr. Garces Angulo went to sleep, awaking to find himself in the throes of motion sickness that would perpetuate until he made landfall in the United States.  For perspective, Jaime Gracia Chere testified in trial that when the PSV began having engine issues in open sea waters, Mr. Garces Angulo was so sick that he could merely advise as to possible resolutions to the engine issues as opposed to taking physical action.

Despite Mr. Garces Angulo's failures in the instant case, he has never been an individual motivated by greed or power. Rather, his criminal record, or lack thereof, reflects a man who believes in an honest day's work for an honest day's pay. Respectfully, in this case the circumstances of the voyage do mitigate Mr. Garces Angulo's blameworthiness. Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (Feb. 2005)(stating that while a defendant's blameworthiness should be considered according to the nature and seriousness of the crime, it can also be assessed according to "the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or diminished capacity").

Returning to the contention that the first § 3553(a) factor requires a sentencing court to view a defendant's crime through the lens of his entire life, Mr. Garces Angulo's case establishes the wisdom of perspective. The essential question present is whether Mr. Garces Angulo's crime reflects his true nature, or whether it is a result of poor circumstances intertwined with little to no chance for upward mobility. Does a nearly 60-year-old man in poor health undertake the dangers incumbent in traversing open ocean waters in a vessel not likely to be seaworthy for avarice, or is there something more to it?  I submit, respectfully Your Honor, it is the latter.  When the totality of Mr. Garces Angulo's life is considered, it is highly likely that his criminal behavior is precipitated from three of life's necessities: medical care, food on the table, and shelter for his loved ones. Thus, if *Adelson's* admonition that courts should consider a defendant's overall existence in imposing his sentence has any meaning, the undersigned respectfully submits a variance is warranted in Mr. Garces Angulo's case.

2. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment.**

Mr. Garces Angulo is charged with a drug offense that correlates with a base offense level of 38, criminal history category one, calling for an incarceration sentence between 235 and 293. United States probation is recommending a two-level increase for obstruction of justice and if attributed, Mr. Garces Angulo's total offense level would be 40, calling for a recommended sentence of 292 to 365 months of incarceration. Mr. Garces Angulo is not blind to the harm caused by the illegal narcotics found on the vessel with him, both on an individual end user and also to the innocent bystanders victimized by those ruthless souls who *are* driven by greed, who show no concern for humankind.

The overriding struggle in any criminal court is striking the balance in sentencing to impact a person and hopefully deter that person from ever making such a criminal decision again. To that end, there is also the question of whether the person can actually be impacted. Some will not change no matter the sentence; others will never recidivate regardless of the sentence, while many others are at risk of committing further offenses but can be deterred with the correct sentencing measures imposed.

Mr. Garces Angulo likely will never see his father again. His son's health will not improve without the means to obtain medication, thus putting his life at risk. This is his true punishment, and this is the result of his decision to act. For these reasons, amongst others to be articulated at sentencing, it is counsel's submission that Mr. Garces Angulo will not recidivate, regardless of the sentence imposed. To that end, depending on the sentence imposed, Mr. Garces Angulo may never live as a free man again. Certainly, this Honorable Court must impose a reasonable sentence; however, the man being sentenced has a history of hard work, appreciation for doing the right thing, and diligence in caring for his family. Mr. Garces Angulo is not a career criminal, nor is he one who has made his livelihood from criminal activity. Respectfully, Mr. Garces Angulo's conduct throughout his life exhibit that he does respect the law, and as such, a harsh punishment based upon this factor is not necessary in this case.

Mr. Garces Angulo has lived in Colombia his entire life and has done his best to lawfully provide for his family. He is not a weak-minded man, nor is he a criminal. The instant he boarded the vessel and it made it to sea, Mr. Garces Angulo became a liability due to his seasickness. Rather than help facilitate the mission of the journey, he laid on the hull of the boat, becoming so dehydrated he nearly expired. While Mr. Garces Angulo may have performed some work on a boat motor prior to the boat making way, trial testimony exhibited that he did not

participate once aboard the vessel.  He had no ownership interest in any of the drugs, nor did he participate in any planning of the voyage.

Mr. Garces Angulo is not the sum of this, his worst deed.  Like his crewmates and many others before him, he was apprehended by law enforcement as he endeavored upon a fool's errand.  Nevertheless, he is not the drug dealer purchasing lavish jewelry or vehicles with the spoils of illegal activity, nor did he violently compel others to aid his endeavors.  Time and again the poor of central and South America are interdicted in a similar fashion and brought thousands of miles from home more often than not because they simply can no longer endure their conditions.  Need provides a different light than does desire and respectfully, Mr. Garces Angulo is before this Court because of his own poor choice, albeit it a poor choice aimed to better he and his family's conditions. Because of this, Mr. Garces Angulo respectfully submits that a sentence below the recommended guideline is appropriate.

**3.  The Need to Afford Adequate Deterrence to Criminal Conduct.**

The principle of general deterrence is based on the unsupported premise that lengthy prison sentences deter crime.  This faulty conception has resulted in the mass incarceration of individuals in the United States.

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy. In fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015), *available at* https://www.brennancenter. org/publication/what-caused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks:  Is There a "Collective Wisdom?"*, 59 Crime & Delinquency 1006, 1031-33 (2013).  Kleck and Barnes' study concludes:

> there is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental    link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

*Id*. at 1031. The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014). In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id*.; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963) ("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

**4.  To Protect the Public from Further Crimes of the Defendant.**

Having established that prison sentences, regardless of length, have no impact on general deterrence, this section demonstrates that the § 3553(a) factor of specific deterrence also supports Mr. Garces Angulo's request for a variance.  This section focuses on studies establishing that incarceration has no effect on recidivism.

*The Relationship Between Incarceration and Recidivism*

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to*

*Keep Communities Safe* (2016).  As the following discussion establishes, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions.  Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

A 2016 study conducted by the National Institute of Corrections (NIC) establishes three critical tenets regarding incarceration and specific deterrence.  First, incarceration has a negligible impact on crime prevention.  *See also* Vera Instit. of Justice, *Overview of The Prison Paradox: More Incarceration Will Not Make Us Safer* (July 2017) (concluding that research shows a "weak relationship between incarceration and crime reduction, and highlights proven strategies for improving public safety that are more effective and less expensive than incarceration").[2]  Instead, a longer prison sentence may actually lead to a greater risk of recidivism. *See id*. There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties, and exposing less serious offenders to older more serious offenders- leads to increased recidivism.  *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007).

Moreover, harsh penalties do not improve the long-term outcomes of the offender. Longstanding research has found that imprisonment brings about negative individual-level changes that can harm re-integration upon release.  National Research Council. *The Growth of Incarceration in the United States: Exploring Causes and Consequences,* (Nat'l Acad. Press 2014), available at. https://doi.org/10.17226/1861; *see also* Friedrich Nietzsche, *The Genealogy*

---

[2] The United States Sentencing Commission has determined that "[t]here is no correlation between recidivism and guidelines' offense level. . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism."  *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (May 2004).

*of Morals*, essay 2, aph. 14 (1887). ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

Finally, the 2016 study concludes that community correction programs are more effective than incarceration in reducing recidivism. *See* R. S. Frase et al, *Criminal History Enhancements Sourcebook* (2015) (discussing studies establishing the crime that "custody is associated with higher rates of re-offending than community sentences."). Thus, the most effective way to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections.

While Mr. Garces Angulo will be deported back to Columbia upon his release, these studies in sociology and criminology span continental borders. Human nature is human nature, regardless of native country. The numbers do not show a benefit to longer incarceration, and given Mr. Garces Angulo's situation, a shorter sentence would allow him to return home and again try to provide for his family in a legitimate fashion. In the absence of a deterrent effect, Mr. Garces Angulo submits that a sentence of 120 months is sufficient, but not greater than necessary to comply with the provisions of § 3553.

**5. To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.**

Given that Mr. Garces Angulo is from a country whose economy is poor, learning a skill or enhancing the skills he already possesses, could be critical in his ability to earn a better living for himself and his family upon release from prison. He has expressed an interest in pursuing a

vocational training program, and he is willing to learn "anything and everything," but shows specific interest in mechanics and welding.

***The Kinds of Sentences Available***

Because Mr. Garces Angulo is charged with a Class A felony, he is not eligible for probation per statute.

***The Kinds of Sentences and Guidelines Range Established***

As noted earlier, Mr. Garces Angulo's drug guidelines alone, call for a sentence between 235 and 293 months' imprisonment.[3] The calculated sentence of 292 to 365 months, based solely on the drug quantity, is predicated on drug guidelines that a majority of federal judges believe are too harsh. Indeed, "73.7 percent of district court judges and 82.7 percent of circuit court judges [rate] drug punishments as greater than appropriate to reflect the seriousness of drug trafficking offenses." (*See* USSC, *Fifteen Years of Guideline Sentencing, An Assessment of How Well the Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 52.

The base offense level of 38 reflected in the pre-sentence report was required due to the amount of cocaine found on the vessel. Mr. Garces Angulo was not a major participant in this voyage and had no control over the plans, nor did he have any knowledge as to the amount of cocaine aboard. Although ignorance is no excuse, it should be considered as to Mr. Garces Angulo's role in transporting the drugs.

Respectfully, based upon the foregoing, Mr. Garces Angulo submits that the requested sentence of 120 months' imprisonment, which falls in line with the minimum mandatory sentence, is sufficient but not greater than necessary to satisfy the objectives of § 3553.

***The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar***

---

[3]This statement does not include the recommended two-level increase for obstruction of justice as for this section's argument it is not relevant.

*Records Who Have Been Found Guilty of Similar Conduct*

Because of the recurring and essential problems with the sentencing guidelines, drug sentences necessarily reflect widespread judicial disagreement with the guidelines. For example, in fiscal year 2014, sentences below the guideline range were imposed in over 60% of all drug cases, including departures that were government sponsored. (*See* U.S. Sent'g Comm'n, *2014 Sourcebook of Federal Sentencing Statistics*, tbl. 27).

Reviewing the sentences imposed for Mr. Garces Angulo's co-defendants, it seems a variance from the Guidelines is appropriate. Roni Linares was identified as the Captain of the PSV and was in charge of the transportation efforts; upon Mr. Garces Angulo and his initial crewmates boarding the PSV, Roni Linares and Israel Lavariega Antonio commanded each of the crewmembers, instructing them to lay on the floor so that they would not see the destination coordinates. Linares was sentenced to 91 months after cooperating to some extent with the United States.  Despite his cooperation, he was clearly in a power position within this conspiracy and bore more culpability than most of the other crewmen, Mr. Garces Angulo included.

Israel Lavariega Antonio was a recipient of the drugs who was sentenced to 135 months, in comparison to Mr. Garces Angulo's recommended guideline of 292 to 365 months. Jailer Quinones Castro was sentenced to 120 months and Jaime Gracia Chere was sentenced to 66 months after receiving a Rule 35 substantial assistance motion for testifying against Mr. Garces Angulo.  Both of these crewmembers were active participants who continually assisted the trek across the open sea; whereas Mr. Garces Angulo was too sick to offer any help to the crew while on board.

Considering the types of sentences that have been imposed on drug cases, including the co-defendant's cases specifically, Mr. Garces Angulo submits that a 120-month prison sentence

is not antagonistic to the concept of disparity.  His role was limited by his medical condition and even excising that fact, his culpability was no more than that of Jaime Gracia Chere or Jailer Quinones.  Mr. Garces Angulo exercises his constitutional right to a jury trial; however, he did not take the witness stand and attempt to mislead the jury or commit a fraud upon the court.

### CONCLUSION

As the foregoing establishes, the unique circumstances presented in Mr. Garces Angulo's case, a variance below the applicable guideline range is warranted. Because the decision in *Booker* has made the Guidelines advisory and the parsimony clause of 18 U.S.C. § 3553(a) the paramount consideration, Mr. Garces Angulo respectfully submits that a variance is appropriate pursuant to this significant sentencing statute.

Respectfully submitted this 23rd day of June, 2022.

/S/ Jason M. Mayberry
Mayberry Law Firm, LLC
Jason M. Mayberry
FL Bar# 36212
Attorney for Defendant
3630 W. Kennedy Blvd.
Tampa, FL 33609
Ph- 813.444.7435
Fx- 727.755.0098
jason@mayberryfirm.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by Electronic Filing Service to the Office of the United States Attorney, this 23rd day of June, 2022.

/S/ Jason M. Mayberry
Jason M. Mayberry